**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No. _____

**LORELLE THOMPSON,**

     **Plaintiff,**

**v.**

**FORD MOTOR COMPANY,**
**a Delaware company,**

     **Defendant.**

**COMPLAINT WITH JURY DEMAND**

     COMES NOW PLAINTIFF, LORELLE THOMPSON, complaining of FORD MOTOR COMPANY, Defendant herein, and for cause of action states:

**I.**

**NATURE OF THE ACTION**

     1.    This is a civil action arising out of serious, permanent, life-scarring personal injuries sustained by Lorelle Thompson on or about December 27, 2016 arising from a defective Ford Expedition (the "Vehicle").

     2.    Plaintiff brings this automotive, products liability, personal injury action for her damages sustained, including, but not limited to pain, suffering, permanent disfigurement and scarring, physical impairment, loss of earning capacity, and loss of enjoyment of life.

     3.    This products liability action includes claims for strict products liability, general negligence, gross negligence, reckless conduct, breach of warranty, and fraud.

4.     The claims asserted herein arise from the design, selection, inspection, testing, manufacture, assembly, equipping, marketing, distribution and sale of a defective and unreasonably dangerous Vehicle.  Defendant was were aware, at all times, of its actions and acted with careless and flagrant disregard for the safety and welfare of drivers who they knew would purchase its vehicles.  Defendant has committed fraud, and has gone to great length to hide the truth, knowing that its fraud would kill or injure thousands of Americans. Those Americans include the Plaintiff who has brought this action.

## II.

### <u>Parties</u>

5.     PLAINTIFF LORELLE THOMPSON is an individual and resident of El Paso County, Colorado.

6.     DEFENDANT FORD MOTOR COMPANY (also referred to as "FORD") is a for-profit corporation which has become one of the largest automobile manufacturers in the world. FORD is a Delaware corporation and maintains its principal place of business in Dearborn, Michigan. FORD manufactures and sells automobiles through its related subsidiaries and/or operating units, including but not limited to dealers, independent retail dealers, outlets and authorized dealerships primarily in Japan, North America, Europe and Asia, including the subject Vehicle.  FORD has been directly involved in the safety investigation and determinations made as to the motor vehicle safety issues arising from the defective and unreasonably dangerous condition of certain FORD brand vehicles it designs, manufactures and distributes for sale to the consuming public, including the subject Vehicle. FORD has been actively involved in developing knowledge of this motor vehicle safety issue over the last decade, and the actions and/or inactions of same relating to the public safety hazard.  Defendant FORD may be served through its registered agent

for service, The Corporation Company, 7700 E. Arapahoe RD., Suite 220, Centennial, CO 80112-1268.

**III.**

**J**URISDICTION AND **V**ENUE

7.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on complete diversity of citizenship between Plaintiff and Defendant. Plaintiff is a citizen of the State of Colorado. Defendant is a corporation and is incorporated under the laws of Delaware, and has its principal place of business in Dearborn, Michigan. The amount in controversy exceeds $75,000, exclusive of interest and costs.

8.     This Court has personal jurisdiction over Defendant FORD pursuant to the Colorado Long-Arm Statute, § 13-1-124, C.R.S., in that FORD transacted business in the State of Colorado, made contacts within the State of Colorado, and/or committed a tortious act in this State.

9.     Further, this Court has personal jurisdiction over Defendant FORD because the exercise of jurisdiction comports with Colorado's long-arm statute and constitutional due process since Colorado's long-arm statute is coextensive with the constitutional limitations imposed by the Due Process Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution. The exercise of jurisdiction over FORD in this case by the State of Colorado comports with due process because FORD has the requisite minimum contacts with Colorado such that having to defend a lawsuit in Colorado will not offend traditional notions of fair play and substantial justice. In all, FORD's contacts with the State of Colorado are such that it is foreseeable that FORD could reasonably anticipate being haled into court here.

10.     Minimum contacts may be established in two ways. First, general jurisdiction exists where the defendant has "continuous and systematic" contacts with the forum state such that

exercising personal jurisdiction is appropriate even if the cause of action does not arise out of those contacts. Second, specific jurisdiction exists where the cause of action is "related to" or "arises out of" the defendant's activities within the forum state. In such cases, jurisdiction is proper where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State.

11.     In general, specific jurisdiction may be had over a nonresident defendant where that defendant purposefully directed its actions at the forum state or purposefully availed itself of the privilege of conducting activities or consummating a transaction in the forum state. This inquiry ensures that an out-of-state defendant is not bound to appear to account for merely random, fortuitous, or attenuated contacts with the forum state.

### A.     General jurisdiction

12.     This Court also has general jurisdiction over FORD because at all times material hereto, FORD conducted business in Colorado and maintained sufficient continuous and systematic contacts with Colorado such that the exercise of jurisdiction over FORD would not offend traditional notions of fair play and substantial justice.

### B.     Specific jurisdiction.

13.     Colorado has specific jurisdiction over FORD because Plaintiff's claims are "related to" or "arise out of" FORD's activities within Colorado. In other words, jurisdiction is proper because FORD's contacts proximately result from actions by FORD itself that create a substantial connection with the State of Colorado. This substantial connection has been established by FORD in purposefully directing its actions at the State of Colorado and purposefully availing itself of the privilege of conducting activities or consummating transactions within Colorado.

14.     Even assuming that FORD's contacts with Colorado may not support general jurisdiction (which Plaintiff denies), its contacts may still meet the less stringent standard for specific jurisdiction if sufficiently related to the claims. Consequently, specific jurisdiction calls for a two-step inquiry: (a) whether the plaintiff has shown that the defendant has minimum contacts with the forum state; and, if so, (b) whether the defendant has presented a compelling case that the presence of some other considerations would render jurisdiction unreasonable.

**1.     Minimum contacts**

15.     The minimum contacts test for specific jurisdiction encompasses two distinct requirements: (i) that the defendant must have purposefully directed its activities at residents of the forum state, and (ii) that the plaintiff's injuries must be related to or arise out of the defendant's forum-related activities.

**a.     Purposeful direction requirement**

16.     Where the defendant deliberately has engaged in significant activities within a State, it manifestly has availed itself of the privilege of conducting business there. In that case, it is presumptively not unreasonable to require the defendant to submit to the burdens of litigation in that forum.

17.     FORD has, at all material times relevant to this case, purposefully directed its conduct toward Colorado by, among other means:

(1)     marketing vehicles through distributors and/or dealers who have agreed to serve as its sales agents in Colorado;

(2)     advertising and promoting its vehicles through media that target Colorado consumers (among others) and/or through channels that would be expected to reach Colorado consumers;

5

(3)     establishing channels for providing regular advice to customers in Colorado;

(4)     designing, developing, manufacturing, testing, marketing, distributing, and/or selling vehicles for the market in Colorado;

(5)     placing into the stream of commerce the subject Vehicle with the knowledge that it could reach Colorado;

(6)     placing into the stream of commerce the subject Vehicle that was involved in an accident in Colorado in which Plaintiff, a Colorado resident, was injured;

(7)     placing into the stream of commerce FORD vehicles with the clear understanding that its vehicles will find their way to Colorado;

(8)     marketing the subject Vehicle model and other vehicles for sale via television and print advertising in Colorado;

(9)     creating and maintaining a website (https://www.ford.com/) to promote business goodwill with consumers in the United States, including consumers in Colorado;

(10)    creating and maintaining a "dealer locator" function on the https://www.ford.com/ website that directs Colorado consumers to FORD dealerships located in Colorado based on zip codes;

(11)    establishing and maintaining authorized dealers in Colorado for the sale of FORD automobiles;

(12)    establishing and maintaining business relationships with automotive dealers in the State of Colorado. A website maintained by Autotrader shows that

there are seventeen dealers within 100 miles of Denver zip code 80201 that sell new Ford and Lincoln vehicles (FORD's brands).[1] On information and belief FORD makes millions of dollars in profits on an annual basis from its business relationships with Colorado dealers. In addition, on information and belief FORD offers Colorado dealers benefits, discounts, and/or incentives that the dealers would not otherwise have but for their relationships with FORD as dealers. Further, on information and belief FORD sells parts and accessories in Colorado primarily to its dealerships (which in turn sell these products to retail consumers) and to authorized parts distributors (which in turn primarily sell these products to retailers). (See FORD's Form 10-K filing for the fiscal year ending December 31, 2017). Thus, even if the Colorado dealers are "independent" dealers, their business relationships with FORD demonstrate an intentional and concerted effort by FORD to target the State of Colorado;

(13)   on information and belief, offering extended service contracts for vehicles purchased by Colorado consumers;

(14)   licensing or otherwise authorizing Colorado dealers to use the FORD name to market its vehicles. An exemplar, the Freeway Ford dealer located in Denver, Colorado, is shown below:

---

[1] See https://www.autotrader.com/car-dealers/New/Ford/Denver+CO-
80201?zip=80201&searchRadius=100&state=CO&city=Denver&makeCodeList=FORD&listingTypes=
NEW&sortBy=distanceASC&numRecords=25&firstRecord=0



The use of the FORD name on the dealer's storefront also suggests that the dealer has a special relationship with FORD or that the dealer is company owned;

(15)    operating Ford Motor Credit Company, LLC ("Ford Credit'), FORD's financial services arm, in the State of Colorado in order to finance the purchase of vehicles by Colorado consumers. According to FORD's Form 10-K for 2017, FORD's "wholly-owned subsidiary Ford Credit offers a wide variety of automotive financing products to and through automotive dealers throughout the world. The predominant share of Ford Credit's business consists of financing our vehicles and supporting our dealers." As described in Ford Credit's Facebook Page, Ford Credit maintains business operations and employs personnel in Colorado Springs, CO. In addition, the Better Business Bureau website shows that Ford Credit maintains an address in Colorado Springs, CO;

    (16)    on information and belief, making and/or purchasing retail installment sales contracts and other financing products through Ford Credit for new and used vehicles purchased by Colorado consumers;

    (17)    on information and belief, making wholesale loans to dealerships in Colorado through Ford Credit to finance the purchase of vehicle inventory, otherwise known as floorplan financing;

    (18)    obtaining authorization through the Colorado Secretary of State to conduct business in the State of Colorado and designating an agent in Colorado for receipt of summonses and other forms of civil process.

18.    At all times relevant herein, FORD expected or should have expected that its acts would have consequences within the United States, and in the State of Colorado in particular. At all relevant times, FORD had knowledge that a Colorado resident could be injured by its defective vehicles.

19.    Because FORD's vehicles come into Colorado as a result of a deliberate, even if indirect, effort of the Defendant to serve Colorado's market, FORD may be said to have purposefully availed itself of the protections of this Sate and is subject to jurisdiction here.

20.    Thus, jurisdiction over Ford is reasonable when considering the following factors:

    (1)    the burden on the defendant;

    (2)    Colorado's interest in resolving the dispute;

    (3)    the Plaintiff's interest in receiving convenient and effective relief;

    (4)    the interstate judicial system's interest in obtaining the most efficient resolution of the controversies;

(5)     the shared interest of the several states in furthering fundamental social policies.

21.     In the instant case, the burden on FORD is minimal given the relatively convenient nature of modern air travel between Michigan and Denver. Litigating in Colorado is minimally more burdensome, if at all, than litigating in Michigan. Moreover, it is likely that FORD will be represented by Denver-based counsel. Regarding the second factor, Colorado has an interest in seeing that its citizens, such as Lorelle Thompson, are compensated for injuries caused by defective products in this State. Regarding the third factor, Ms. Thompson, who became physically incapacitated as a result of the incident in question and who has been treated by doctors located in Colorado, would find more convenient and effective relief in Denver. Regarding the fourth factor, the interstate judicial system's interest in efficient resolution of controversies supports an exercise of jurisdiction in Colorado because the case was first filed in Colorado. Regarding the fifth factor- -the shared interest of the several states in furthering fundamental social policies—does not appear to favor or disfavor an exercise of jurisdiction here. *See C5 Medical Werks, LLC v. CeramTEc GmbH*, No. 14-cv-00643 (D. Co. Sept. 8, 2014) (providing similar analysis of the five factors).

**b.     Plaintiff's injuries are related to FORD's forum-related activities.**

22.     If the sale of vehicles by FORD is not simply an isolated occurrence, but arises from the efforts of the manufacturer to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective product has been the source of injury to its owner. Colorado does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in this State.

23.     At all times relevant herein, FORD conducted substantial business in Colorado, regularly caused its products to be sold in Colorado, and the cause of action arises out of a tort committed in Colorado, and, therefore, personal jurisdiction is proper under the Colorado Rules of Civil Procedure and the Due Process Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution. Consequently, the exercise of personal jurisdiction over FORD would be consistent with traditional notions of fair play and substantial justice.

24.     Venue is proper as all or a substantial part of the events or omissions giving rise to the claim occurred in the District of Colorado.  Specifically, the incident made the basis of Plaintiff's claims occurred in El Paso County, Colorado, which is in the District of Colorado.

**IV.**

**STATEMENT OF FACTS**

25.     This case arises as a result of the catastrophic injuries suffered by Lorelle Thompson when her left leg was crushed by a defective and unreasonably dangerous 1998 Ford Expedition (VIN # 1FMRU1764WLB23489) (hereinafter referred to as the "Vehicle").

26.     On December 27, 2016, Lorelle Thompson drove the Vehicle to her community mailboxes to get her mail when she was returning to her home after an errand. The community mailboxes were located on Ramblewood Drive three houses from Lorelle's house. The street in the area of her mailbox was flat. Lorelle put the Vehicle into "Park," left the Vehicle's engine running, opened the door, and stepped out. When she stepped on the ground, she slipped and fell on her back, with her left leg behind the driver's side front wheel. The Vehicle then unexpectedly self-shifted into powered reverse and began to roll backwards. The vehicle rolled over Lorelle's left leg (the "Incident"), crushing it. Lorelle suffered breaks in her tibia (the "shinbone") and in her fibula (the smaller bone in the calf).

11

27.     Lorelle's neighbors called for an ambulance, and Lorelle was transported to Penrose-St. Francis Medical Center in Colorado Springs, Colorado for treatment. Her diagnosis was "Grade 3 open left tibia fracture" and "Left distal fibula fracture." Lorelle's condition was stabilized, and she remained in the hospital until December 30 when a metal pin was placed in her tibia and locked into place using interlocking screws. As a result of the surgeries, Lorelle has a scar that runs from the top of her left foot to her knee. The healed scar looks like plastic skin.

28.     After she was released from the hospital, Lorelle began a program of physical therapy. Lorelle used a wheelchair for months after her hospital stay and couldn't put pressure on her toes. When she was able to discontinue using the wheelchair, she used a walker for approximately one year until around April 2018. Since then, Lorelle has had to frequently use a cane.

29.     Lorelle does not have full use or range of motion of her left foot and ankle. For example, when walking up a flight of stairs, she has to first step up with her right foot and then bring her left foot up, and then repeat the process. She cannot lead with her left foot. Also, she cannot climb ladders to do household chores such as dusting high places and changing light bulbs. She cannot walk long distances or stand for long periods of time. She does not have good balance and cannot stand on her left foot. She also has a limp. Her leg injury affects many aspects of her life on a daily basis. Some of the activities she did on an occasional basis that she cannot do are running and dancing.

30.     In addition, Lorelle suffers pain in her left leg every day, and when the weather turns cold, the pain becomes worse. Her left leg from the knee down feels numb, like it is plastic, and the severe scarring makes her leg look like plastic.

31.     Because of her injuries, Lorelle missed time from work and cannot perform the

duties required by her previous place of employment and the other types of employment that she had prior to the Incident. Now, she is limited in the types of jobs that she can perform; she is not able to work at jobs that require extended walking, stooping, lifting, and, in general, physical labor.

32.     The condition of Lorelle's left leg is, more likely than not, permanent. She will continue to suffer from pain, physical impairment, and disfigurement, and continue to incur medical expenses, for the rest of her life. Lorelle's life expectancy is approximately 26 years.

**V.**

**ALLEGATIONS REGARDING THE PARK-TO-REVERSE DEFECT AND FORD MOTOR COMPANY'S KNOWLEDGE AND CONDUCT**

33.     A "park-to-reverse" defect can exist in a vehicle equipped with an automatic transmission when there is inadequate mechanical force ("detenting force") to ensure that a vehicle always defaults into an intended gear position (such as park or reverse) when an operator inadvertently does not fully shift into the very center of the intended gear position.

34.     In a vehicle with a park-to-reverse defect, an operator of the vehicle in normal use can inadvertently and unintentionally place the shift selector *between* the intended park and reverse gear positions.  Rather than defaulting into the park or reverse gear position, as it would in a properly designed vehicle which meets industry standards (and Ford's own standards), the shift selector can remain for a period of time (several seconds or longer) *between* the intended park and reverse gear positions and from this "false park" position the vehicle then may (or may not) have a delayed engagement of powered reverse.

35.     Because of the possible delay in the engagement of reverse gear when an operator places the vehicle into what the operator would reasonably believe to be "park" based on the vehicle's cues, the park-to-reverse defect is unreasonably dangerous since an operator may have

exited the vehicle, or be exiting the vehicle, when the vehicle suddenly and unexpectedly moves backwards in powered reverse.

36.     As a result of injuries and deaths resulting from park-to-reverse accidents in vehicles equipped with an automatic transmission (also referred to as "inadvertent rearward movement") from at least the 1950's and 1960's, the automobile industry, and FORD in particular, has long been aware of the defect, and the need to design vehicles so as to prevent the vehicle's shift selector from being inadvertently placed in a position *between* the intended park and reverse gear positions from which the vehicle can then have a delayed engagement of reverse.

37.     Defendant FORD, specifically, was well aware of the need to design its automatic transmission system so that an operator could not leave the vehicle between park and reverse from which there could be a delayed engagement of reverse.  Notice to Defendant FORD, well prior to Lorelle Thompson's injuries, of the need to design vehicles to avoid a park-to-reverse defect included:

      a.    numerous park-to-reverse accidents in various vehicles made by Defendant FORD in the 1970's, 1980's and 1990's about which Ford received notice through customer complaints.  These included hundreds of complaints on a wide range of models equipped with the same or substantially similar transmission as in the Vehicle;

      b.    FORD investigated the park-to-reverse safety issue in the early 1970's.  It was, at that time, the third highest volume safety complaint being logged in Customer Relations Potential problem reports;

c.      numerous reports of injuries and deaths and an investigation by the National Highway Traffic Safety Administration ("NHTSA") of Defendant FORD's vehicles equipped with C-3, C-4, C-6, FMX and JATCO Automatic Transmissions.   In 1980, NHTSA received reports of over 23,000 problems of inadvertent vehicle movement on FORD built vehicles, resulting in 5,593 accidents, 1,720 injuries, and 97 deaths.

d.      in February 1980, FORD reported knowledge of 2,252 accidents, 1,818 property damage, 703 injuries and 42 fatalities involving vehicles where inadvertent rearward movement was involved. FORD also reported at least 361 lawsuits involving allegations of inadvertent rearward movement.

e.      in a political agreement signed with the Department of Transportation, over the objections of NHTSA, on December 30, 1980, FORD agreed to send warning labels to approximately 22 million owners rather than, as NHTSA believed necessary, recalling them for mechanical repair.

f.      a 1985 NHTSA study found that FORD park-to-reverse accidents had caused a total of at least 306 deaths.

g.      in October 1991, FORD instituted a recall of Ford Aerostars, Bronco II's, Explorers and Rangers built in 1989 – 1991 to remedy a park-to-reverse problem in these vehicles.

15

h.    well aware of the cause of the defect, and its danger, Ford designed the circuit boards in certain of its vehicles so Ford could easily install an out-of-park alarm to warn drivers when the vehicle was in false park.

38.    Despite numerous accidents, injuries, and deaths in park-to-reverse accidents, Defendant FORD elected not to install out-of-park alarms on *all* of its vehicles susceptible to park-to-reverse problems (and only recently installed them on a few vehicles such as the Ford Escape) or design its vehicles' transmissions to prevent the problem.  Ford instead adopted a consistent policy of refusing to admit the existence of the defect in the vehicles, and instead blaming any resulting accidents, injuries, or deaths on "operator error."

39.    The standard of care in the automobile industry is to fully investigate complaints or reports received by an automobile manufacturer which appear to pose a potential or actual safety risk.

40.    The investigative process by which complaints or accident reports are investigated is a technique called "root cause analysis" in which the vehicle manufacturer's engineering staff or outside consultants will (a) determine if the issue is safety-related; (b) carefully analyze the complaint to fully understand it; (c) attempt to reproduce the complaint on the subject vehicle or an exemplar; (d) determine if the problem is a manifestation of a unique vehicle feature (*e.g.,* a vehicle manufacturing defect); (e) if the problem is not so identified, identify the engineering feature of the product which allows for the mechanical system to perform in the manner complained of; and (f) determine if there is an engineering solution through redesigning the product which will prevent it as a mechanical system from manifesting the complaint in the system or if an adequate redress is not feasible, then warn adequately to prevent injury.

16

41.     Despite the engineering standard being to conduct all necessary root cause analysis upon receiving complaints, and the fact that FORD conducted numerous root cause analyses on other potential and actual defects, FORD intentionally and purposefully avoided conducting any adequate root cause analysis on the park-to-reverse defects on any of its vehicles so as to avoid identifying a defect which would require Defendant FORD to undertake expensive measures to fix defective and dangerous vehicles which had been, and were being, sold to its customers and the public .

42.     Defendant FORD's refusal over a period of over 20 years to conduct appropriate and necessary "root cause analysis" was purposeful and intentional and was done with the understanding that its failure to conduct root cause analysis and identify and fix the park-to-reverse defect on its vehicles would result in injuries and deaths, including the injuries to Plaintiff Lorelle Thompson.

43.     It is appropriate engineering practice in the automobile industry to conduct a Design Failure Mode and Effects Analysis (DFMEA) any time a manufacturer or a supplier of the product creates a new design, makes a design change to an existing design, or has a different application of an existing component or subsystem.

44.     In a DFMEA, engineers engage in a process by which they attempt to identify potential issues that may be presented by the design, redesign, or pairing of components.  In a DFMEA, all prior complaints, campaigns, warranty data or other documentation available on a specific component or system company-wide is reviewed and analyzed to identify potential failure modes of a product, develop a test protocol to test for each of the potential failure modes, and through completing such tests to rule out (or identify) the ability of a design, redesign or pairing of components to fail as have earlier designs.

45.     Had an adequate DFMEA been conducted on the transmission systems on Defendant FORD's other vehicles, or the Vehicle, it would have easily identified the park-to-reverse defect in the Vehicle.

46.     Yet despite the fact that DFMEA is a standard procedure conducted by Defendant FORD, at no time did FORD conduct any adequate DFMEA on the transmission system of the Vehicle, or of other of its vehicles as it related to the well-known park-to-reverse problems.

47.     The decision not to conduct an adequate DFMEA on the transmission system of the Vehicle, or other of Defendant FORD's vehicles, was purposeful and intentional so as not to identify the park-to-reverse defect which would require its being remedied and expose FORD to having to fix at considerable expense prior defective vehicles.

48.     As discussed below Defendant FORD's acts in failing to design so as to prevent the park-to-reverse defect, test the vehicle to determine if the park-to-reverse defect existed, warn of the danger via an out-of-park alarm, or remedy the park-to-reverse defect in the Vehicle once it was produced was intentional and purposeful and demonstrated a conscious disregard for public safety in that Defendant FORD knew that accidents, serious injuries, and even death, such as that suffered by Plaintiff Lorelle Thompson would result from Defendant FORD's actions and omissions.

49.     These actions constitute malice, oppression, and/or fraud and were undertaken with the approval of, and were ratified by officers, directors, and managing agents of the company on behalf of Defendant FORD.

## VI.

### CONDITIONS PRECEDENT

50.     All conditions precedent to the bringing of this action and Plaintiff's right to the relief sought herein have occurred, have been performed, or have been excused.

## VII.

### TOLLING OF THE STATUTE OF LIMITATIONS

51.     Upon information and belief, Defendant FORD has known of the park-to-reverse defects in its vehicles well before the Plaintiff purchased the Vehicle, yet concealed from and failed to notify the Plaintiff and/or the public about the full and complete nature of the defects in the Vehicle or other vehicles of its kind prior to the Incident.

52.     Any applicable statute of limitations has therefore been tolled by Defendant's knowledge, active concealment, and denial of the facts alleged herein, behavior which is ongoing to the present day.

53.     Accordingly, this action has been timely commenced within the applicable period of limitation.

## VIII.

### CLAIMS FOR RELIEF

### COUNT ONE – STRICT LIABILITY IN TORT

54.     Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

55.     At all times relevant herein, Defendant FORD was in the business of manufacturing and selling vehicles, including the subject Vehicle and others like it, throughout the United States, including Colorado.

56.     FORD is strictly liable for designing, testing, manufacturing, distributing, selling and/or placing a defective and unreasonably dangerous product into the stream of commerce.

57.     At all times relevant herein, the subject Vehicle was defective and unreasonably dangerous as to the design, manufacture, distribution and warnings, causing the Vehicle to be in a defective condition that made it unreasonably dangerous for its intended use.  At all times relevant herein, FORD took part in the manufacture and sale of the subject Vehicle prior to the Incident made the basis of this Complaint.

58.     At all times relevant herein, the subject Vehicle was being used in an intended and/or foreseeable manner when the Incident alleged herein occurred.  Plaintiff neither misused nor materially altered the subject Vehicle, and upon information and belief, the subject Vehicle was in the same or substantially similar condition that it was in at the time of purchase from Defendant or at time it was placed on the market.

59.     At all times relevant herein, the subject Vehicle was unreasonably dangerous and defective because it was designed, manufactured and sold with a defective transmission and/or steering column that caused the park-to-reverse Incident described herein.

60.     At all times relevant herein, FORD was aware of feasible alternative designs which would have minimized or eliminated altogether the risk of injury posed by the Vehicle.

61.     At all times relevant herein, FORD had a duty to warn users of the dangers associated with the Vehicle.

62.     All at times relevant herein, FORD failed to warn of the inherent and latent defects that made the Vehicle dangerous and unsafe for its intended use.

63.     At all times relevant herein, FORD failed to design, test, and manufacture, inspect, and/or sell the Vehicle and like vehicles that were safe for their intended use.

64.     As a direct and proximate result of FORD's conduct complained of herein, Plaintiff has suffered serious and permanent injuries including broken bones, scarring, and excruciating pain and suffering, emotional distress, physical impairment, disfigurement, loss of enjoyment of life, medical expenses, and loss of earning capacity from the Incident.

65.     WHEREFORE, Plaintiff demands judgment against Defendant for all actual and compensatory damages she has suffered, together with interest, if applicable, for all costs of this action, and for any other such further relief as this Honorable Court and/or jury may deem just and proper.

**IX.**

**COUNT TWO--NEGLIGENCE, GROSS NEGLIGENCE, WILLFUL AND WANTON MISCONDUCT: DESIGN DEFECT**

66.     Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if they are fully set forth herein.

67.     At all times relevant herein, FORD designed, selected, inspected, tested, assembled, equipped, marketed, distributed and sold for profit, the Vehicle.

68.     At all times relevant herein, FORD designed the Vehicle owed Plaintiff a duty of reasonable care to design, select, inspect, test, assemble, equip, market, distribute and sell the Vehicle and its components so that it would provide a reasonable degree of safety during foreseeable operation of the Vehicle in the real-world highway environment of its expected use.

69.     At all times relevant herein, as designed, selected, inspected, tested, assembled, equipped, marketed, distributed and sold by FORD, the Vehicle is and was defective, unreasonably dangerous and unsafe for foreseeable users and occupants because of its park-to-reverse defect.

70.     At all times relevant herein, FORD was negligent, grossly negligent, willful,

wanton, reckless and careless in the design of the subject Vehicle and breached its duties of care owed to Plaintiff by:

    a.    failing to adopt and implement adequate safety hierarchy procedures and policies;

    b.    failing to design, manufacture, test, assemble and/or install the gear shifting mechanisms so that the vehicle would not unintentionally shift from "park" to "reverse";

    c.    failing to exercise reasonable care in the design of the subject Vehicle;

    d.    failing to exercise reasonable care in the testing of the subject Vehicle;

    e.    failing to exercise reasonable care in the inspection of the subject Vehicle;

    f.    failing to adopt and implement adequate warnings regarding the subject Vehicle;

    g.    failing to incorporate appropriate quality assurance procedures in the design of the subject Vehicle;

    h.    and on such other and further particulars as the evidence may show.

71.    At all times relevant, as a direct and proximate results of Defendant's negligence and breaches complained of herein, Plaintiff has suffered serious and permanent injuries including broken bones, scarring, and excruciating pain and suffering, emotional distress, physical impairment, disfigurement, loss of enjoyment of life, medical expenses, and loss of earning capacity from the Incident.

72.    WHEREFORE, Plaintiff demands judgment against Defendant for all actual and compensatory damages she suffered, together with interest, if applicable, for all costs associated

with having to bring this action, and for any other such further relief as she may show herself entitled to.

## X.

### COUNT THREE–NEGLIGENCE, GROSS NEGLIGENCE, WILLFUL AND WANTON CONDUCT: MANUFACTURING DEFECT

73.     Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

74.     At all times relevant herein, FORD took part in and/or was responsible for the manufacture, selection, inspection, testing, design, assemblage, equipment, marketing, distribution, and/or sale of the Vehicle.

75.     FORD manufactured the Vehicle owed Plaintiff a duty of reasonable care to manufacture, select, inspect, test, assemble, equip, market, distribute, and sell the Vehicle and its components so that they would provide a reasonable degree of safety during foreseeable operation of the Vehicle in the real-world highway environment of its expected use.

76.     At all times relevant herein, as manufactured, selected, inspected, tested, assembled, equipped, marketed, distributed and sold by FORD, the Vehicle was defective, unreasonably dangerous, and unsafe for foreseeable users and occupants because of the park-to-reverse defect and failed to provide the degree of safety a reasonable consumer would expect during foreseeable use.

77.     At all times relevant herein, FORD was negligent, grossly negligent, willful, wanton, reckless and careless, and breached its duties of care owed to Plaintiff by:

> a.     failing to adopt and implement adequate safety hierarchy procedures and policies;

23

b.     failing to design, manufacture, test, assemble and/or install the gear shifting mechanisms so that the vehicle would not unintentionally shift from "park" to "reverse";

c.     failing to exercise reasonable care in the testing of the subject Vehicle;

d.     failing to exercise reasonable care in the inspection of the subject Vehicle;

e.     failing to adopt and implement adequate warnings regarding subject Vehicle;

f.     failing to incorporate appropriate quality assurance procedures in the manufacture of the subject Vehicle; and

g.     on such other and further particulars as the evidence may show.

78.     As a direct and proximate result of the FORD's negligence and the breaches complained of herein, Plaintiff suffered serious and permanent injuries broken bones, scarring, and excruciating pain and suffering, mental anguish, emotional distress, physical impairment, disfigurement, loss of enjoyment of life, medical expenses, and loss of earning capacity from the Incident

79.     By reason of the foregoing, Plaintiff is entitled to recover for all general and special damages she has suffered as a direct and proximate result of FORD's negligent and grossly negligent acts or omissions.

80.     WHEREFORE, Plaintiff demands judgment against Defendant for all actual and compensatory damages she has suffered, together with interest, if applicable, for all costs of this action, and for any other such further relief as this Honorable Court and/or jury may deem just and proper and that she may show herself entitled to.

24

## XI.

### COUNT FOUR – FAILURE TO WARN

81.     Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

82.     At all times relevant herein, FORD, as manufacturer of the subject Vehicle, owed duties to warn of foreseeable dangerous conditions of the subject Vehicle.

83.     At all times relevant herein, FORD knew or should have known of the subject Vehicle's park-to-reverse defect.

84.     At all times relevant herein, FORD would have had no reason to believe that users would realize this potential danger.

85.     At all times relevant herein, FORD affirmatively failed to exercise reasonable care to inform users of the Vehicle's dangerous conditions created by the park-to-reverse defect.

86.     As a direct and proximate result of FORD's failures to warn of the dangers posed by the park-to-reverse defect in the subject Vehicle and the breaches complained herein, Plaintiff suffered injuries including broken bones, scarring, and excruciating pain and suffering, emotional distress, physical impairment, disfigurement, loss of enjoyment of life, medical expenses, and loss of earning capacity from the Incident.

87.     By reason of the foregoing, Plaintiff is entitled to recover for all general and special damages she sustained as a direct and proximate result of FORD's negligent and grossly negligent acts or omissions.

88.     WHEREFORE, Plaintiff demands judgment against Defendant for all actual and compensatory damages she suffered, together with interest, if applicable, for all costs of this action, and for any other such relief as this Honorable Court and/or jury may deem just and proper.

## XII.

### Count Five – Breach of Implied Warranty

89.      Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

90.      At all times relevant herein, FORD was a "merchant" as to the subject Vehicle within the meaning of Colorado's Uniform Commercial Code.

91.      At all times relevant herein, FORD manufactured and sold the subject Vehicle, which is a "good" within the meaning of Colorado's Uniform Commercial Code.  Consequently, at the time of its sale, FORD impliedly warranted that the subject Vehicle, including its component parts, was merchantable, such that it was fit for its ordinary purpose as a safe passenger vehicle and that it could pass without objection in the trade, and that it was adequately contained, packaged and labeled.

92.      At all times relevant herein, FORD breached the implied warranty of merchantability as it concerns Plaintiff because the subject Vehicle was not fit for the ordinary purposes for which it was anticipated to be used – namely as a safe passenger motor vehicle.

93.      Specifically, the subject Vehicle was unreasonably dangerous and defective because it was designed, manufactured and sold with a park-to-reverse defect, which made the subject Vehicle unfit for its ordinary purpose of providing safe transportation.

94.      At all times relevant herein, FORD further breached the implied warranty of merchantability to Plaintiff as the subject Vehicle it designed, manufactured and sold contained a park-to-reverse defect, and therefore, it would not pass without objection in the trade.

95.      At all times relevant herein, FORD further breached the implied warranty of merchantability to Plaintiff because the subject Vehicle was not adequately contained, packaged

and labeled in that the directions and warnings that accompanied the subject Vehicle did not adequately instruct buyers on the proper use of the Vehicle in light of the park-to-reverse defect.

96.     As a proximate result of FORD's collective and respective breaches of the implied warranty of merchantability, Plaintiff has suffered serious and permanent injuries including broken bones, scarring, and excruciating pain and suffering, emotional distress, physical impairment, disfigurement, loss of enjoyment of life, medical expenses, and loss of earning capacity from the Incident.

97.     By reason of the foregoing, Plaintiff is entitled to recover for all general and special damages proximately caused by FORD's breaches of its implied warranty of merchantability relating to the Vehicle.

98.     WHEREFORE, Plaintiff demands judgment against Defendant for all actual and compensatory damages she suffered, together with interest, if applicable, for all costs of this action, and for any other such further relief as this Honorable Court and/or jury may deem just and proper.

## XIII.

### COUNT FOUR – FRAUD

99.     Plaintiff hereby adopts, restates and re-alleges each and every paragraph of this Complaint as if fully and completely set forth herein.

100.     FORD made representations to the Plaintiff that it had designed, manufactured and sold vehicles which were safe to be driven.

101.     FORD's representations were material to the Plaintiff, as evidenced by the fact that Plaintiff elected to purchase the Vehicle for her use.

102.     FORD's representations were false.

2:20-cv-12044-AJT-EAS   ECF No. 1   filed 07/30/20   PageID.28   Page 28 of 30

103.     When FORD made these misrepresentations to Plaintiff, FORD made the misrepresentations recklessly, as a positive assertion, and with knowledge of their truth.  In fact, FORD did so intentionally in an effort to conceal the various defects.

104.     FORD made the misrepresentations with the intent that Plaintiff act on them.

105.      Plaintiff relied on the misrepresentations, as evidenced by the fact that Plaintiff purchased the Vehicle.

106.     These misrepresentations caused the Plaintiff's extensive injuries. As a proximate result of FORD's misrepresentations, Plaintiff has suffered serious and permanent injuries including broken bones, scarring, and excruciating pain and suffering, emotional distress, physical impairment, disfigurement, loss of enjoyment of life, medical expenses, and loss of earning capacity from the Incident.

107.     By reason of the foregoing, Plaintiff is entitled to recover for all general and special damages proximately caused by FORD's fraud relating to the Vehicle.

108.     WHEREFORE, Plaintiff demands judgment against Defendant for all actual and compensatory damages she suffered, together with interest, if applicable, for all costs of this action, and for any other such further relief as this Honorable Court and/or jury may deem just and proper.

## XIV.

### COMPENSATORY DAMAGES

109.     Plaintiff hereby adopts, restates, and re-alleges each and every paragraph of this Complaint as if fully and completely set forth herein.

110.     As a direct and proximate result of FORD's conduct, more particularly described above, Plaintiff suffered, sustained, and incurred the following injuries and damages, among others:

a.       Medical and health care expenses in the past;

b.       Medical and health care expenses in the future;

c.       Pain and suffering in the past;

d.       Pain and suffering in the future;

e.       Physical impairment in the past;

f.       Physical impairment in the future;

g.       Disfigurement in the past;

h.       Disfigurement in the future;

i.       Lost wages/loss of earning capacity in the past;

j.       Loss of earning capacity in the future;

k.       Loss of enjoyment of life in the past;

l.       Loss of enjoyment of life in the future;

m.       Expenses for unnecessary repairs;

n.       Attorney's Fees (where recoverable) and Costs; and

o.       Other damages.

111.    Plaintiff would show that her damages, injuries and/or losses are within the jurisdictional limits of this Court, and include the above damages, and any other consequential damages foreseeably arising from the incidents in question.

## XV.

### DEMAND FOR JURY TRIAL

112.    Plaintiff hereby requests a trial by jury on all issues of fact and has tendered the requisite fee.

29

## XVI.

### <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff LORELLE THOMPSON respectfully prays that Defendant FORD MOTOR COMPANY be cited to appear and answer herein, and that upon trial, Plaintiff have and recover the following:

1.      judgment against Defendant for compensatory damages in excess of the minimum jurisdictional limits of the Court;

2.      costs of this suit, including attorneys' fees;

3.      pre-judgment interest in accordance with Colorado law;

4.      post-judgment interest in accordance with Colorado law; and

5.      such other and further relief as this Court may deem proper and just.

Respectfully submitted,

*/s/ Bradly J. Holmes*
Bar. No. 15584
Bradly J. Holmes, P.C.
9800 Mt. Pyramid Court, Suite 400
Englewood, CO 80112
Tel.: 303-594-7600
holmeslaw@comcast.net

Bradley L. Leger
(*Colorado Federal Bar Admission pending*)
Texas Bar No. 24039899
bleger@lkclawfirm.com
Rodney K. Castille
(*Colorado Federal Bar Admission pending*)
Texas Bar No. 03984300
rcastille@lkclawfirm.com
10077 Grogan's Mill Road, Suite 325
The Woodlands, Texas 77380
Tel: (832) 764-7200
Fax: (832) 764-7211
**ATTORNEYS FOR PLAINTIFF**